U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 JUN 16 PM 1:36

CLERK

BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

TINA MARIE SWEET,               )
                                )
        Plaintiff,              )
                                )
    v.                          )        Case No. 2:16-cv-110
                                )
NANCY A. BERRYHILL,             )
Acting Commissioner of Social Security,  )
                                )
        Defendant.              )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
PLAINTIFF'S MOTION FOR AN ORDER REVERSING THE
COMMISSIONER'S DECISION AND DENYING THE COMMISSIONER'S
MOTION TO AFFIRM**
(Docs. 13 & 17)

Plaintiff Tina Marie Sweet is a claimant for Social Security Disability Insurance

("SSDI") and Supplemental Security Income ("SSI") benefits under the Social Security

Act. She brings this action pursuant to 42 U.S.C. § 405(g) to reverse the decision of the

Social Security Commissioner that she is not disabled.[1] On November 2, 2016, Plaintiff

filed her motion to reverse (Doc. 13). On February 2, 2017, the Commissioner moved to

affirm (Doc. 17). Plaintiff replied to the Commissioner's motion on March 20, 2017,

whereupon the court took the pending motions under advisement.

Plaintiff identifies the following errors in the Commissioner's decision: (1)

Administrative Law Judge ("ALJ") Thomas Merrill failed to find that Plaintiff had severe

impairments including affective disorder and anxiety-related disorder and failed to

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a continuous period of not less than 12
months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental
impairment or impairments" must be "of such severity" that the claimant is not only unable to do
any previous work but cannot, considering the claimant's age, education, and work experience,
engage in any other kind of substantial gainful work which exists in the national economy. 42
U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

include any mental health limitations in Plaintiff's residual functional capacity ("RFC"); (2) his error regarding the severity of Plaintiff's mental health impairments was not harmless because his subsequent findings improperly relied on testimony by vocational expert ("VE") James Parker; (3) his RFC finding was not supported by substantial evidence; and (4) he erred in according only limited weight to the opinions of Plaintiff's primary care provider, Deborah Thompson, P.A.

Arthur P. Anderson, Esq. represents Plaintiff. Special Assistant United States Attorneys Lorie E. Lupkin and Susan J. Reiss represent the Commissioner.

## I.    Procedural History.

Plaintiff applied for SSDI and SSI benefits on January 3, 2013, alleging a disability onset date of January 5, 2010. The Commissioner denied Plaintiff's claims initially, and upon reconsideration. Plaintiff thereafter filed a timely request for a hearing before an ALJ.

At an October 29, 2014 video conference hearing before ALJ Merrill, Plaintiff appeared with non-attorney representative Meriam Hamada,[2] and testified. VE Parker also testified. In a decision dated January 14, 2015, ALJ Merrill found that Plaintiff did not establish that she was disabled within the meaning of the Social Security Act. Plaintiff filed a timely appeal, which the Appeals Council denied on February 26, 2016. As a result, ALJ Merrill's decision stands as the Commissioner's final decision.

## II.    Factual Background.

Plaintiff resides in Colchester, Vermont and was born in 1973. She received a general equivalency diploma. Her past employment includes work as a line supervisor and machine packer at a soap factory, a customer service employee at American International Distribution Center, and an admitting clerk at a hospital. She claims disability on the basis of "[b]ack injury[,]" "[d]epression[,]" and "arthritis." (AR 212.)

---

[2] The transcript of the hearing before ALJ Merrill refers to Plaintiff's representative as "Miriam Hermado." The court adopts the spelling proffered in Plaintiff's motion ("Meriam Hamada").

## A. Plaintiff's Physical Health.

In June 1987, Plaintiff suffered a lumbar compression deformity at L1, L2, and L3 and underwent a thoracolumbar fusion. Several months later, she sustained injuries in a motor vehicle accident that required the implantation of metal rods which were subsequently removed. She has experienced back pain since that time.

On September 15, 2010, Plaintiff visited P.A. Thompson, her primary care provider, to receive treatment for chronic back pain. She complained that her back pain had worsened and was radiating to her right leg, and reported that she had difficulty driving, sitting, or standing longer than fifteen minutes without shifting positions, and was limited in her ability to perform household chores. P.A. Thompson recorded that Plaintiff was taking OxyContin, Percocet, Flexeril, and Ibuprofen for pain. She further observed that Plaintiff "moves cautiously" and "shifts positions frequently[.]" (AR 427.) P.A. Thompson referred Plaintiff to a pain clinic.

Between December 2010 and July 2011, Plaintiff received treatment from several physicians at the Tilley Pain Clinic at Fletcher Allen Health Care. On December 9, 2010, Daniel Gianoli, M.D. documented that Plaintiff had full range of motion in her neck, full strength in her lower extremities, and normal sensation. Neurological and musculoskeletal examinations were normal except for tenderness in Plaintiff's back. Approximately one month later, Tiffini Lake, M.D. administered lumbar facet joint injections and recorded that Plaintiff "denies depression." (AR 620.) On April 27, 2011, Melissa Covington, M.D. administered lumbar medical branch block injections. During these visits, Plaintiff's providers documented that she had a normal gait and ambulated without an assistive device.

Plaintiff received additional treatment from Dr. Covington on June 24, 2011 and July 22, 2011, reporting that she had developed neck pain, which was alleviated but not eliminated by medication. Dr. Covington noted that Plaintiff had a mildly antalgic gait, but was alert and oriented. Neurological examinations were normal on both treatment dates. Dr. Covington documented "tenderness with palpation over lower thoracic and upper lumbar paraspinal levels" and that there "appear to be multiple trigger points along

3

her surgical incisional site" and noted decreased forward bending and range of motion in Plaintiff's back. (AR 614.) Dr. Covington administered trigger point injections into Plaintiff's lumbar paraspinal muscles. In treatment notes dated November 29, 2011, P.A. Thompson documented that the injections did not provide relief, but also noted that Plaintiff was alert and appeared to be in no distress. On January 2, 2012, P.A. Thompson examined Plaintiff, who had complained of stiff and sore hands, and recorded that Plaintiff exhibited no redness or swelling.

Beginning in February 2012, Plaintiff visited rheumatologist James Trice, M.D. for treatment for stiffness and soreness in her hands that she had experienced for the previous two to three months, and for which she was taking Ibuprofen. On February 9, 2012, Dr. Trice assessed that Plaintiff exhibited normal strength, gait, and station, recorded that a joint examination revealed no swelling or pain, and that Plaintiff's wrists, elbows, shoulders, hips, knees and ankles "reveal[ed] no pain with passive motion." (AR 758.) He determined that Plaintiff had "[j]oint pain with a mildly elevated rheumatoid factor and antinuclear antibody but without other clinical evidence and no significant synovitis on exam to implicate either rheumatoid arthritis[,] systemic lupus erythematosus, or a related autoimmune inflammatory connective tissue disease." (AR 760.) One month later, on March 15, 2012, Dr. Trice detected tenderness and swelling in Plaintiff's hands, slight swelling in both wrists, and slight tenderness in her right wrist. Hand x-rays revealed a "questionable cyst" (AR 746) at the base of one phalanx in Plaintiff's left hand which was not confirmed on a different view. Dr. Trice diagnosed Plaintiff with inflammatory arthropathy, but could not confirm a diagnosis of either rheumatoid arthritis or systemic lupus erythematosus.

Throughout the remainder of 2012 and into February 2013, Plaintiff continued to visit P.A. Thompson for medication management and for back pain treatment. During these visits, Plaintiff was oriented and exhibited normal mood, affect, and behavior.[3] On February 20, 2013, Dr. Trice recorded that Plaintiff had "inflammatory arthropathy with

---

[3] During this timeframe, Plaintiff also received treatment for Bell's palsy. However, Plaintiff has not alleged disability on the basis of this impairment.

low titer ANA and rheumatoid factor positivity" and ruled out rheumatoid disease and lupus. (AR 301.) Plaintiff's joint examination was normal. Dr. Trice posited that Plaintiff's swelling was "likely infectious, probably viral" (AR 305) and assessed that her inflammatory arthropathy improved with medication. Six months later, Dr. Trice's examination revealed that Plaintiff's inflammatory polyarthritis had improved with medication.

On May 24, 2013, Plaintiff reported to P.A. Thompson that she had begun using a cane and had recently experienced increased pain in her left side. She was referred to a spine clinic for further examination. Thereafter, Plaintiff received treatment from physician assistant Robert Hemond at the Fletcher Allen Spine Institute. P.A. Hemond observed on June 21, 2013 that Plaintiff exhibited an antalgic gait favoring her left leg, but could heel to toe walk. P.A. Hemond made the following diagnosis:

> [m]usculoskeletal facetogenic back pain, lower extremity symptoms not clearly concordant with lumbar radiculopathy. She may possibly have an L5-S1 nerve root impingement. Her physical exam reveals 5/5 Waddell signs, reflective of psychosocial overlay in her pain. The patient is also very sedentary throughout the day and lays down nearly half the day. Certainly a component of her discomfort is a result of deconditioning.

(AR 600.) P.A. Hemond referred Plaintiff for physical therapy and Plaintiff thereafter underwent an MRI of her lumbar spine. On July 3, 2013, P.A. Hemond noted that the MRI revealed:

> post-surgical changes L1-2 and 3, no sign of significant foraminal narrowing. At 3-4 there is a mild disk bulge and disk degeneration, although the disk height is well-preserved. At 4-5 she has a broad-based disk bulge but no central stenosis. She does have some moderate foraminal narrowing on the left, although there is epidural fat around the nerve root and at 5-1 she has moderate to severe foraminal narrowing on the left, although disk space height is well preserved.

(AR 602.) P.A. Hemond again opined that Plaintiff's back pain is "likely musculoskeletal discogenic and related to deconditioning, while the left lower extremity's symptoms may be a mild intermittent L5 radiculopathy." *Id.* P.A. Hemond further noted that Plaintiff had not attended physical therapy and was not interested in

pursuing injection therapy, and therefore concluded he had "little else to offer" Plaintiff. *Id.*

Following Plaintiff's March 21, 2014 visit, P.A. Thompson recorded that Plaintiff was "feeling more pain" and was limping and using her cane more, but experienced some relief from using a Transcutaneous Electrical Nerve Stimulation ("TENS") unit either daily or every other day for fifteen minutes. (AR 675.) P.A. Thompson documented that Plaintiff had "a hard time getting from sitting to standing" and "can't stand or sit for any length of time without increased pain." *Id.* One week later, P.A. Hemond noted that Plaintiff had "really no significant discomfort" in her back, although she had experienced a moderate amount of discomfort in her left side over the previous three days. (AR 801.) He assessed that Plaintiff had "very infrequent left lower extremity symptoms and overall is doing fairly well" (*id.*) and recorded that Plaintiff had attended physical therapy on a number of occasions since he had last treated her. As a result, P.A. Hemond recommended that Plaintiff continue using her TENS unit, begin a home exercise program, and suggested that she consider weaning off of her medication for pain management.

Plaintiff visited Dr. Trice on June 13, 2014, complaining again of pain in her hands and left elbow. A joint examination revealed no tenderness in her hands and feet and mild tenderness on palpation of her left elbow and full ranges of motion in her remaining joints and lower extremities. Dr. Trice concluded that Plaintiff's inflammatory arthropathy was "reasonably well controlled" and prescribed her Meloxicam. (AR 711.)

On or about September 10, 2014, P.A. Thompson completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) ("Physical Assessment"), wherein she opined that Plaintiff's impairments and pain therefrom would markedly interfere with her ability to concentrate and focus on job-related tasks to the extent that she could not perform such tasks for continuous two-hour periods throughout an eight-hour workday and five-day workweek. P.A. Thompson further expected that Plaintiff's working pace would likely be reduced more than twenty percent from a normal pace. Due to Plaintiff's fatigue, P.A. Thompson assessed that Plaintiff could perform work

6

activities for one hour before needing to rest for fifteen minutes. She opined that Plaintiff's lifting, carrying, standing and walking abilities were affected by her impairments, but did not indicate the degree of such limitations.

### B. Plaintiff's Mental Health.

Plaintiff received treatment and prescribed medication from P.A. Thompson to treat a diagnosis of depression. On November 5, 2010, P.A. Thompson documented that Plaintiff had a "history of depression and recently her symptoms have been worse[,]" noting that plaintiff felt "very stressed partly dealing with this worsening pain, which has been more disruptive to her life, dealing with the fact that she is not working and therefore has financial stresses[.]" (AR 423.) P.A. Thompson noted that Plaintiff enjoyed playing bingo when she was financially able to do so, but was otherwise "pretty isolated." *Id.* P.A. Thompson prescribed Zoloft. Three weeks later, P.A. Thompson recorded that Plaintiff was tolerating that medication well and had experienced less anger, fewer outbursts, and "let go of stressors and frustrations easier." (AR 422.) During both visits, P.A. Thompson noted that Plaintiff appeared in no distress with the exception of occasionally appearing tearful during the November 5, 2010 visit.

Plaintiff continued to visit P.A. Thompson in January and May of 2011, and reported that her prescribed Zoloft was "helping emotionally" (AR 421), but that she still experienced stress. P.A. Thompson documented that Plaintiff exhibited a depressed mood and was tearful. On January 2, 2012, P.A. Thompson recorded that Plaintiff had begun counseling and observed that Plaintiff's "primary symptoms include dysphoric mood and negative symptoms. This is a chronic problem. Suicidal ideas: occasional fleeting thought. She does not have a plan to commit suicide." (AR 402.) P.A. Thompson again noted that Plaintiff was tolerating Zoloft well and was well oriented during September 12, 2012 and December 3, 2012 visits. Following the latter visit, in which Plaintiff exhibited a "depressed mood" (AR 388), P.A. Thompson prescribed Cymbalta to replace Zoloft. P.A. Thompson's January 2, 2013 treatment notes indicated that Plaintiff's transition to prescribed Cymbalta was successful, as she "fe[lt] better but

7

has some reduction in stress too" with "[l]ess crying" and "[n]o suicidal thoughts." (AR 384.)

P.A. Thompson's treatment notes from August 14, 2013, November 4, 2013, December 19, 2013, and March 21, 2014 reveal that Plaintiff continued to take prescribed Cymbalta, in increasing dosages. On each occasion, P.A. Thompson observed that Plaintiff exhibited normal behavior and mood, and was oriented to person, place, and time.

On or about October 14, 2014, P.A. Thompson completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) ("Mental Assessment"), wherein she concluded that Plaintiff suffered from anxiety-related disorder and affective disorder. P.A. Thompson opined that Plaintiff suffered "marked" difficulties in maintaining social functioning and concentration, persistence or pace; "moderate" restrictions in the activities of daily living. (AR 814.) She further opined that Plaintiff would respond inappropriately to criticism from coworkers and supervisors and be unable to focus on job-related tasks for two-hour periods of time during an eight-hour workday. She expected that Plaintiff would miss two days of work per month because of her mental health impairments.

###    C.    Plaintiff's Function Report.

On or about February 25, 2013, Plaintiff completed a Function Report in support of her application for SSDI and SSI benefits. She reported that she had difficulty managing her personal care, could no longer prepare non-microwaveable meals, and could not sleep for more than a couple of hours at a time. She stated that she could still perform certain household chores, drive, and manage her personal finances. Regarding her hobbies and interests, she reported that she "watch[es] tv all the time, bingo maybe once or twice a month" but could not go bowling anymore. (AR 207.) She spent time with her family on a weekly basis.

Plaintiff explained that she had problems interacting with others, as she "fe[lt] like people [we]re talking about me all the time" and "get[s] anxious around a lot of people[.]" (AR 208.) She recounted having arguments with "a few bosses" (AR 209) in

8

the past and stated that she could no longer adequately follow spoken instructions unless she wrote them down. Plaintiff stated that she used a cane and had been prescribed Cymbalta, Lyrica, Roxicodone, Percocet, Flexeril, and Plaquenil. In summary, Plaintiff wrote that she:

> get[s] a lot of confusion, feel[s] depressed all the time, and ha[s] noticed that I have a lot of anxiety over the past few years d[ue] to feeling helpless and hopeless because of my pain and make a lot of mistakes when I never did before. My hands don't work anymore they hurt [j]ust opening [and] closing them. I can only write a few lines before my hand cramps up on me.

(AR 210.)

### D. State Consultants' Assessments.

#### 1. March 2013 Disability Evaluation.

On March 14, 2013, Plaintiff met with State Medical Consultant Barbara Richmond, M.A. for a confidential disability evaluation. Ms. Richmond's report indicates that she is a "Licensed Clinical Psychologist – Master." (AR 576.) Ms. Richmond recorded that Plaintiff arrived on time and was appropriately dressed, but "displayed a sad affect, crying intermittently during the evaluation." *Id.* She nonetheless maintained eye contact, exhibited well organized thoughts, and displayed no cognitive deficits. Ms. Richmond noted that Plaintiff sat "stiffly and wincing at times[,]" walked with a slow gait and a limp, and winced when reaching for a piece of paper. *Id.*

Plaintiff completed a Mini-Mental Status Exam ("MMSE") and received a score of thirty, indicating no cognitive impairment. Ms. Richmond observed that Plaintiff was oriented to time and place, and "successfully performed tasks demonstrating immediate and delayed recall" and demonstrated reading, naming, repetition, and copying skills. (AR 578.) The remainder of Ms. Richmond's evaluation documents Plaintiff's self-reports regarding her background and medical history, including arthritis, insomnia, low energy, suicidal ideation, and irritability. Based on this evaluation, Ms. Richmond

recorded a diagnosis of "major depressive disorder, recurrent episodes, moderate" and social anxiety, and assigned Plaintiff a GAF score of 50.[4] (AR 578-79.)

## 2. March 2013 State Consultants' Assessments.

On March 25, 2013, State Medical Consultant Howard Goldberg, Ph.D. submitted a Medically Determinable Impairments ("MDI") and a Mental RFC analysis as part of the Social Security Administration's ("SSA") evaluation of Plaintiff's disability application. Dr. Goldberg did not examine Plaintiff, but rendered his opinions based upon Plaintiff's medical records and Ms. Richmond's consultative examination. Dr. Goldberg found that Plaintiff had affective disorder and anxiety disorder, assessing that Plaintiff had "moderately limited" (AR 64) abilities to carry out detailed instructions and maintain attention and concentration for extended periods, but retained the capacity for one to three step tasks. Dr. Goldberg further opined that Plaintiff could not perform four-step tasks or "timed or productivity standards" and was restricted from "intensive and frequent social interactions" but could engage in ordinary and routine social interactions. (AR 65-66.) Dr. Goldberg found that Plaintiff exhibited no marked restrictions in any functional area.

On April 15, 2013, non-examining State Medical Consultant Leslie Abramson, M.D. rendered an opinion as to Plaintiff's physical RFC. Dr. Abramson opined that Plaintiff could sit, stand and/or walk for six hours in an eight-hour workday, lift ten pounds "frequently" and twenty pounds "occasionally," and stoop. (AR 63.) Dr.

---

[4] "The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" *Kohler v. Astrue*, 546 F.3d 260, 262 n.1 (2d Cir. 2008) (quoting Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (hereafter "DSM-IV")). GAF scores rate the overall psychological functioning of an individual on a scale of 0 to 100, with higher scores reflecting greater functioning. *See Corporan v. Comm'r of Soc. Sec.*, 2015 WL 321832, at *12 n.9 (S.D.N.Y. Jan. 23, 2015). "A GAF score in the range of 41 to 50 indicates '[s]erious symptoms (*e.g.,* suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (*e.g.,* no friends, unable to keep a job).'" *Zabala v. Astrue*, 595 F.3d 402, 406 n.2 (2d Cir. 2010) (quoting DSM-IV at 34). The GAF scale has been removed from the latest version of the DSM. *See Corporan*, 2015 WL 321832, at *12 n.9.

Abramson further assessed that Plaintiff had no other postural limitations and had no manipulative limitations.

### 3. July 2013 State Consultants' Assessments.

On July 30, 2013, upon reconsideration, non-examining State Medical Consultant Ellen Atkins, Ph.D. submitted MDI and Mental RFC analyses to the SSA. Her findings were identical to those of Dr. Goldberg. On or about the same day, non-examining State Medical Consultant Geoffrey Knisely, M.D. submitted a physical RFC assessment to the SSA upon reconsideration of Plaintiff's application. Dr. Knisely found that Plaintiff could sit, stand and/or walk for six hours in an eight-hour workday, and would need to change positions for three to five minutes per hour. He determined that Plaintiff could "frequently" lift ten pounds, climb ramps and stairs, and crawl; and "occasionally" lift twenty pounds, climb ladders, ropes, or scaffolds, stoop, and crouch. (AR 90-91.) Dr. Knisely further concluded that Plaintiff had no balancing, pushing, or pulling limitations. Regarding Plaintiff's reported hand stiffness, Dr. Knisely opined that "the actual objective evidence does not support limitations in manipulative category" and that her pain had been taken into consideration in this RFC assessment. (AR 91.)

Dr. Knisely assessed that Plaintiff's statements regarding her symptoms were only "[p]artially credible" because they were "not fully supported by the objective evidence or by her actual activities reported on the function report." (AR 90.) Dr. Knisely cited Plaintiff's need for a cane, but observed that "the evidenc[e] does not support that this is required" and that Plaintiff's "5/5 Waddell signs . . . indicate Psych overlay on physical exam." *Id.*

### E. Plaintiff's Testimony at the October 29, 2014 Hearing.

Plaintiff testified that shortly before her alleged onset date, her medication regimen had changed and as a result, she could no longer concentrate at work and made many errors. Due to her performance, she was "let go" by her employer. (AR 42.) Plaintiff testified that she had difficulty standing and sitting for long periods of time, which she attributed to back pain. She further stated that she has arthritis, which limits her ability to write, and Bell's Palsy, which impacts her vision.

11

On a typical day, Plaintiff rises at six o'clock in the morning to take medication, returns to sleep until nine o'clock, and remains in bed until approximately ten o'clock, whereupon she uses her TENS unit for twenty minutes and watches television or occasionally vacuums her bedroom. She testified that she uses the Internet in order to maintain contact with family members through Facebook.

In response to questioning by her representative, Plaintiff testified that she has difficulty cooking, performing household chores including washing dishes and vacuuming, shopping, sleeping, and driving. She testified that she uses a cane when she performs housework or has to walk long distances in a parking lot. She stated she is "lucky if I sleep for an hour and a half, two hours at a time, and then it takes me a while to try and fall back to sleep. I'm tired all the time because I don't sleep." (AR 45.) She explained that the pain in her hands prevents her from opening jars, and that injections have not ameliorated the pain. She testified that she has back pain every day, which on many occasions prevents her from getting out of bed, and that she can only remain in a seated position for approximately two hours before she requires a break.

Plaintiff recounted problems at her prior jobs, including missing time due to back pain, depression, "wanting to commit suicide, and not being around people. I have a problem, I feel like people are talking about me all the time and I don't know if I just jump to conclusions, but I get angry and then don't talk to anyone." (AR 48.) She further testified that when she watches television, she experiences difficulty comprehending what she is watching and remembering what she had just finished watching.

### III.  ALJ Merrill's Application of the Five-Step, Sequential Evaluation Process.

In order to receive SSDI or SSI benefits, a claimant must be disabled on or before his or her date last insured. SSA regulations set forth the following five-step, sequential evaluation process to determine whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant has a severe impairment or combination of
> impairments; (3) whether the impairment meets or equals the severity of the
> specified impairments in the Listing of Impairments; (4) based on a

12

"residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R.

§§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)). "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, and bears the burden of proving his or her case at [S]teps [O]ne through [F]our of the sequential five-step framework established in the SSA regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation marks and citation omitted). At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150 (alterations in original) (internal quotation marks omitted).

In this case, ALJ Merrill determined that Plaintiff's date last insured was June 30, 2015, and that Plaintiff had not engaged in substantial gainful activity since January 5, 2010. At Step Two, ALJ Merrill found that Plaintiff had the following severe impairment: "degenerative disc disease (lumbar spine, thoracic spine)" (AR 12). While noting that Plaintiff alleged disability due to depression, ALJ Merrill concluded that the "evidence of record shows that her depression produced no more than minimal limitations upon the claimant's ability to perform work-related activities." *Id.* ALJ Merrill also concluded that Plaintiff's arthritis was non-severe, citing Plaintiff's limited treatment for that impairment.

At Step Three, ALJ Merrill determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of any listed impairment. At Step Four, he concluded that Plaintiff had the residual functional capacity to "perform light work as defined as in [20 C.F.R. § 404.1567(b)] and [20 C.F.R. § 416.967(b)]" and that "[s]he is able to occasionally stoop, with no limitations in her ability to push and pull." (AR 15.) ALJ Merrill observed that:

[t]he objective evidence in this claim falls short of demonstrating the existence of pain and limitations that are so severe that the claimant cannot perform any work on a regular and continuing basis. The claimant testified

to an extremely limited range of functional abilities. However, the objective medical evidence of record does not fully support those allegations. Therefore, because the claimant has failed to establish a correlation between the allegations and the objective medical evidence, the undersigned finds the claimant's symptom complaints not credible to the extent alleged[.]

(AR 17.) Based in part on VE Parker's testimony, ALJ Merrill determined that Plaintiff was capable of performing her past relevant work as a customer service worker and admitting clerk, and thus concluded that Plaintiff was not disabled within the meaning of the Social Security Act. ALJ Merrill did not undertake a Step Five analysis, but noted that "with mental health assumed as severe, and with the mental residual function as opined by Dr. Goldberg, PhD, adopted by Ellen Atkins, PhD, the impartial vocational expert opined that the claimant would still be able to perform other jobs available in significant numbers within the national economy[.]" (AR 14.)

## IV. Conclusions of Law and Analysis.

### A. Standard of Review.

In reviewing the Commissioner's decision, the court "'conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied.'" *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008)). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g). It is the Commissioner that resolves evidentiary conflicts and determines credibility issues, and the court may not substitute its own judgment for that of the Commissioner. *See Aponte v. Sec'y, Dep't of Health & Human Servs. of U.S.*, 728

F.2d 588, 591 (2d Cir. 1984) ("It is the function of the [Commissioner], not the reviewing courts, to resolve evidentiary conflicts and to appraise the credibility of witnesses.") (internal quotation marks omitted).

"[T]he [Social Security Administration] recognizes a treating physician rule of deference to the views of the physician who has engaged in the primary treatment of the claimant[.]" *Burgess*, 537 F.3d at 128 (internal quotation marks omitted). Under this rule, the opinions of "treating sources"[5] are "binding if . . . supported by medical evidence and not contradicted by substantial evidence in the record." *Selian*, 708 F.3d at 418. However, a treating source's "statement that the claimant is disabled cannot itself be determinative." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

To weigh the opinion of a treating source, an ALJ must consider, among other things, the length, frequency, nature, and extent of the treatment relationship; the consistency of the opinion offered with the "record as a whole"; and whether it is "of a specialist about medical issues related to his or her area of specialty[.]" 20 C.F.R. §§ 404.1527(c)(2), (4), (5) & 416.927(c)(2), (4), (5). An ALJ is "required either to give [the opinions of a claimant's treating source] controlling weight or to provide good reasons for discounting them." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010).

SSA regulations further distinguish between "acceptable medical sources" and other health care providers who are not "acceptable medical sources." SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). "[O]nly 'acceptable medical sources' can be considered treating sources . . . whose medical opinions may be entitled to controlling weight." *Id.* Evidence submitted by non-acceptable medical sources "cannot establish the existence of a medically determinable impairment" but "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.*

---

[5] "Treating source means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation considered for your medical condition(s)." 20 C.F.R. § 404.1527(a)(2).

15

In evaluating the opinions of non-acceptable medical sources, the ALJ considers the same factors applicable to medical opinions rendered by "acceptable medical sources" pursuant to 20 C.F.R. § 404.1527. *Id.* at *4 ("Although the factors in 20 C.F.R. § 404.1527(d) and § 416.927(d) explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors can be applied to opinion evidence from 'other sources.'").

### B. Whether ALJ Merrill Erred in Failing to Find That Plaintiff Had Severe Mental Health Impairments.

Plaintiff argues that ALJ Merrill committed reversible error by failing to find that she suffered severe mental health impairments of affective disorder and anxiety-related disorder and failing to reflect these impairments in his RFC determination. The government contends that ALJ Merrill properly found that Plaintiff's mental health impairments were not severe and, in any event, considered her mental health limitations in rendering Plaintiff's RFC.

In order for an impairment to be "severe" pursuant to Step Two of the sequential analysis of a claimant's application for benefits, SSA regulations provide that the claimant's impairment must "significantly limit[] [his or her] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). If the ALJ "rate[s] the degrees of [the claimant's] limitation as 'none' or 'mild,' [the ALJ] will generally conclude that [the] impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities[.]" *Id.* § 404.1520a(d)(1). The Second Circuit has held that the ALJ's Step Two analysis is "applied to screen out *de minimis* claims[.]" *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995) (holding that "the severity regulation is valid only if applied to screen out *de minimis* claims").

In this case, ALJ Merrill analyzed the functional areas set forth under applicable regulations for evaluating Plaintiff's alleged mental impairments and found that Plaintiff had only a "mild limitation" (AR 12-13) in the activities of daily living, social functioning, and in her ability to maintain concentration, persistence, and pace. In

support of those findings, he cited her MMSE score indicating no cognitive impairments, Plaintiff's abilities to perform housework, meals, go shopping, and manage her personal finances, and her social interactions with friends and family both in person and online and her outings to play bingo. ALJ Merrill further concluded that Plaintiff had experienced no episodes of decompensation of extended duration.

Plaintiff points out, however, that three medical sources diagnosed her with mental health impairments, and argues that ALJ Merrill did not provide good reasons for discounting these opinions in his severity analysis. He assigned only limited weight to the opinions of Ms. Richmond, who diagnosed Plaintiff with major depressive disorder, recurrent episodes, social anxiety, and assigned her a GAF score of 50.[6] ALJ Merrill's explanation for the degree of weight he accorded Ms. Richmond's opinions was as follows: (1) Ms. Richmond's report was "based upon the self-reported symptoms of the claimant, with apparently no other records reviewed and no other objective evidence relied upon" (AR 13); (2) she rendered her opinions without performing a "function-by-function analysis of the claimant's abilities, but instead merely list[ed] her reported symptoms" (*id.*); and (3) she "d[id] not indicate whether the claimant has had past psychiatric treatment or note whether the claimant's treatment has been limited, or whether the claimant would benefit from additional treatment" (*id.*).[7]

---

[6] Plaintiff correctly points out that Ms. Richmond identifies herself as a "Licensed Clinical Psychologist – Master" in her report (AR 576), and therefore ALJ Merrill should have designated her an acceptable medical source. *See Martell v. Comm'r of Soc. Sec.*, 2013 WL 1429459, at *4-5 (D. Vt. Mar. 22, 2013) (citing the SSA's Program Operations Manual DI 22505.004(A)(3) and holding that the ALJ erred in not recognizing that a licensed or certified psychologist was an acceptable medical source), *report and recommendation adopted by* 2013 WL 1429457 (D. Vt. Apr. 9, 2013).

[7] Plaintiff faults ALJ Merrill for failing to address Plaintiff's GAF score. While the better practice would be to acknowledge the consistency of Plaintiff's GAF scores, "the utility of [a GAF score] is debatable, particularly after its exclusion from the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders." *Berry v. Comm'r of Soc. Sec.*, 2015 WL 4557374, at *3 n.10 (S.D.N.Y. July 29, 2015); *see also Schneider v. Colvin*, 2014 WL 4269083, at *4 (D. Conn. Aug. 29, 2014) ("Even prior to the release of the DSM–V in 2013, courts have held that an ALJ's failure to consider every GAF score is not a reversible error.").

17

While these reasons accurately characterize Ms. Richmond's report, ALJ Merrill did not note Ms. Richmond's observations that Plaintiff exhibited a sad affect, displayed pain behavior, and cried intermittently during her consultative examination. He also discounted the opinions of Dr. Goldberg and Dr. Atkins, who reviewed Ms. Richmond's report and the remainder of Plaintiff's medical record, and diagnosed Plaintiff with both affective disorder and anxiety disorder. ALJ Merrill assigned "some weight" to Dr. Goldberg's and Dr. Atkins's opinions but did not credit their assessments that Plaintiff exhibited "moderate" (AR 14) limitations in social functioning and in concentration, persistence and pace because they relied in large part on Ms. Richmond's report and were purportedly inconsistent with the record as a whole. Neither of these justifications, however, constitutes a "good reason" to discount the opinions of Dr. Goldberg and Dr. Atkins. Their reports were based upon a review of Plaintiff's entire medical record at the time of their respective reviews, not simply Ms. Richmond's consultative examination. In addition, their endorsement of Ms. Richmond's diagnoses, rather than discrediting their own opinions, bolsters Ms. Richmond's opinions by providing additional, independent support for the conclusion that Plaintiff has medically determinable mental health impairments. By contrast, no medical source in the record has endorsed ALJ Merrill's conclusion that Plaintiff lacks severe mental health impairments. *See Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir.1998) ("In the absence of a medical opinion to support the ALJ's finding . . ., the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.") (internal quotation marks omitted).

Nor are Dr. Goldberg's and Dr. Atkins's diagnoses inconsistent with the record as a whole. Plaintiff has cited significant evidence of mental health impairments that ALJ Merrill did not analyze, including her medication regimen to treat anxiety and depression, P.A. Thompson's treatment notes documenting Plaintiff's suicidal ideation, and Plaintiff's "Job Screening Questionnaires" which summarize her difficulty interacting with others in a work environment. While ALJ Merrill was not required to discuss every piece of evidence in his decision, these undisputed portions of the record demonstrate that

18

the opinions of Dr. Goldberg and Dr. Atkins are in fact supported by substantial evidence and consistent with the record as a whole.

Assessed as a totality, the opinions and diagnoses of three acceptable medical sources and other record evidence cited by Plaintiff establish that her mental health "significantly limits [her] mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c); *see also Keitt v. Barnhart*, 2005 WL 1258918, at *5 n.3 (E.D.N.Y. May 27, 2005) (noting that "the step-two severity test functions simply to weed out *de minimis* claims"). As a result, ALJ Merrill erred in his Step Two analysis to the extent he found that Plaintiff lacked any severe mental health impairments.

## C. Whether ALJ Merrill's Step Two Error Was Harmless.

The government contends that any error at Step Two was harmless because "the ALJ continued with the sequential analysis, considered all of [Plaintiff's] impairments, including her alleged psychological symptoms, and properly assessed her RFC including no restrictions on mental work activities." (Doc. 17 at 19.) Plaintiff counters that because ALJ Merrill's subsequent analysis was based upon VE Parker's testimony which reflected his Step Two error, the error was not harmless.

At the October 29, 2014 hearing, VE Parker testified that Plaintiff's past relevant work consisted of three occupations, as defined in the *Dictionary of Occupational Titles*: line supervisor, a "mixed" occupation that entailed both "hands on" and supervisory work; customer service clerk; and admitting clerk. (AR 51.) ALJ Merrill thereafter questioned VE Parker as follows:

> [Q.] I would like you to assume that we have a 41 year old with a GED, has the ability to lift 20 pounds occasionally, 10 pounds frequently, can stand or walk for six, sit for six, unlimited use of her hands and feet to operate controls and push and pull, can occasionally stoop. The remaining of her posturals are unlimited. There's no other limitations. If we assume that as hypothetical number one, do you have an opinion as to whether she could perform any of the prior work?
>
> A. Your Honor, the past work as a customer service clerk and the hospital admitting clerk could be performed. The other one is a mixed position, I don't believe that's relevant when it's a mixed position. But the other two positions could be performed.

19

Q.     If we add to the first hypothetical that she is limited to one to three step instructions, has the ability to persist, concentrate, and pace for two hour blocks of time during a typical work day and work week, and has the ability to handle ordinary and routine social interactions with the public, coworkers, and supervisors. If we assume that as the second hypothetical, does that change your opinion with regard to these jobs that she can do?

A.     It does, Your Honor. The customer service position and admitting clerk position could no longer be performed because those are midrange semi-skilled and the limitation to one to three step instructions would eliminate those positions. Positions that would be appropriate from that would include assembler, small products. . . , packing line worker. . . , [and] price marker[.]"

(AR 52-53.)

As the hearing transcript reveals, ALJ Merrill's first hypothetical question assumes an RFC that is bereft of mental limitations, including Dr. Goldberg's opinion that Plaintiff cannot perform "timed or productivity standards," carry out detailed instructions and maintain attention and concentration for extended periods, and is restricted from "intensive and frequent social interactions." (AR 65-66.) As a result, the court cannot determine whether, if ALJ Merrill had correctly incorporated the limitations arising from Plaintiff's severe mental impairments within her RFC, his conclusion that Plaintiff can perform her past relevant work would remain unchanged. *See Concepcion v. Astrue*, 2010 WL 4038769, at *4 (D. Conn. Sept. 30, 2010) (holding that "[w]ithout the ALJ's analysis of the relevant evidence, the court cannot determine whether his conclusion would have been different if he had considered all factors" in his RFC determination). VE Parker's testimony suggests that the result could well have been different. *See* AR 52-53 (testifying that if Plaintiff were limited to work involving one to three step instructions she could not perform two of her prior positions). For this reason, ALJ Merrill's finding that Plaintiff could perform her past relevant work does not render his error at Step Two harmless.

Plaintiff further argues that ALJ Merrill's comment that "with the mental residual function as opined by [Dr. Goldberg and Dr. Atkins], the impartial vocational expert opined" that Plaintiff would be able to perform other jobs that exist in significant

20

numbers in the national economy (AR 14) does not render his Step Two error harmless. Plaintiff contends that ALJ Merrill's description of VE Parker's testimony, without more, does not constitute an alternative finding. She further maintains that, assuming *arguendo* that this comment constitutes an alternative finding, ALJ Merrill's second hypothetical question to VE Parker did not actually assume the mental health limitations ascribed to Plaintiff by the state agency consultants, but instead posited an entirely new set of limitations which no medical source in the record had endorsed. The court agrees.

When ALJ Merrill asked VE Parker to assume that Plaintiff could only follow one to three step instructions, he did not ask VE Parker if the alternative occupations he identified would involve "intensive and frequent social interactions" and "timed or productivity standards[,]" which Dr. Goldberg and Dr. Atkins opined were restrictions. (AR 77, 107.) As a result, the hypothetical question to which VE Parker responded contained assumptions that did not accurately reflect the limitations arising from Plaintiff's severe mental health impairments. *See McIntyre*, 758 F.3d 146, 151 (2d Cir. 2014) (stating that "[a]n ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as there is substantial record evidence to support the assumptions upon which the vocational expert based his opinion") (brackets and internal quotation marks omitted). VE Parker's testimony therefore does not address whether Plaintiff's mental limitations prevent her from performing alternative work. *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d Cir. 1981) ("The vocational expert's testimony is only useful if it addresses whether the particular claimant, with his limitations and capabilities, can realistically perform a particular job.").

Because ALJ Merrill's failure to find that Plaintiff has severe mental health impairments was not harmless error, as any limitations resulting from those impairments were not reflected in her RFC or in the ALJ's hypothetical questions to VE Parker, the court GRANTS Plaintiff's motion for an Order reversing the Commissioner's decision on this basis.

## D. Whether ALJ Merrill's RFC Determination Was Supported by Substantial Evidence.

Plaintiff asserts that the ALJ's RFC finding that Plaintiff could perform light work subject to a postural limitation of occasional stooping was not supported by substantial evidence. In rendering that assessment, ALJ Merrill accorded "substantial weight" to the opinions of Dr. Abramson, who opined that plaintiff was limited to light exertional work with occasional stooping due to her back pain. (AR 18.) ALJ Merrill provided several reasons for this decision, including Dr. Abramson's medical expertise, knowledge of SSA regulations, and the consistency of her opinion with Plaintiff's generally mild physical limitations which reveal "persistent and chronic back pain, but also . . . some relief of pain with a TENS unit and injections, and no significant neurological findings upon exam." *Id.* The well-supported opinions of a non-examining state agency consultant may constitute substantial evidence sufficient to support an ALJ's disability determination. *See Graham v. Colvin*, 2014 WL 5645460, at *3 (W.D.N.Y. Oct. 28, 2014) (noting that "the opinions of consultative physicians and State agency consultants can constitute substantial evidence where, as here, they are consistent with the other evidence in the record").

Plaintiff next argues that ALJ Merrill improperly rejected Dr. Knisely's additional postural limitation that Plaintiff would need to change positions for three to five minutes per hour. Regarding that limitation, ALJ Merrill observed that "Dr. Knisely opine[d] that the claimant's alleged limitations are not fully supported by the objective evidence or by her actual activities reported on the function report. He notes that the claimant . . . states she requires a cane to ambulate, but the evidence does not support this requirement." (AR 18.) ALJ Merrill failed to explain, however, why Dr. Knisely's misgivings regarding Plaintiff's purported need to use a cane provides a basis to reject a postural limitation that Dr. Knisely also identified. The medical record reveals that Plaintiff began using a cane shortly before Dr. Knisely submitted his July 2013 report and continued to use a cane throughout the remainder of 2013 and 2014. The treatment notes

22

of several providers, including P.A. Thompson, Dr. Covington, and P.A. Hemond, documented that Plaintiff exhibited an antalgic gait.

ALJ Merrill further found that Plaintiff's 5/5 Waddell signs on exam suggested that "the back pain has no physical cause" and that "three or more are usually considered sufficient to make a diagnosis of functional disorder or deliberate deception (malingering) and to rule out physical abnormality." *Id.* (citing *Ghio v. Astrue*, 2011 WL 923419, at \*19 n.4 (D. Vt. Mar. 1, 2011)) (italics omitted). The medical evidence in the record does not support ALJ Merrill's conclusion. As Plaintiff points out, Dr. Knisely did not draw such an inference from Plaintiff's Waddell signs and P.A. Hemond concluded that this exam suggested a "psychosocial overlay" to Plaintiff's pain (AR 600) rather than any adverse reflection upon Plaintiff's credibility.

An ALJ "is not qualified to analyze raw medical data, and must interpret the medical evidence through the expert opinion of a physician." *Alexander v. Comm'r of Soc. Sec.*, 2014 WL 7392112, at \*8 (D. Vt. Dec. 29, 2014). ALJ Merrill's opinion that Plaintiff's Waddell signs exam suggests that her pain has no physical cause or that she has exaggerated her pain is not supported by the opinion of any medical source. His interpretation of the raw medical data therefore does not constitute a good reason to exclude Dr. Knisely's postural limitation from Plaintiff's RFC.

Based on the foregoing, ALJ Merrill erred in his identification of the physical limitations in Plaintiff's RFC, which are not supported by substantial evidence. Accordingly, the court GRANTS Plaintiff's motion for remand on this additional ground.

## E.   Whether ALJ Merrill Erred in Evaluating the Opinions of P.A. Thompson.

Plaintiff also seeks remand because ALJ Merrill purportedly erred in evaluating the opinions of P.A. Thompson, her primary care provider. She does not dispute that P.A. Thompson, as a physician assistant, is a non-acceptable medical source under SSA regulations. *See* SSR 06-03p, 2006 WL 2329939, at \*2 (providing that physician

assistants are "[m]edical sources who are not 'acceptable medical sources'").[8] As a result, her opinions are not entitled to controlling weight. *See id.* However, Plaintiff contends that ALJ Merrill failed to provide good reasons for affording "limited weight" or "no weight" (AR 12, 19) to P.A. Thompson's opinions. Plaintiff identifies the following "important opinions" (Doc. 13-1 at 16) rendered by P.A. Thompson that purportedly supported her disability application: that Plaintiff would have difficulty responding appropriately to supervisors and co-workers, would be expected to perform tasks more than 20% reduced from a normal pace, and that fatigue would result in her having to rest for fifteen minutes after performing work activities for one hour.

ALJ Merrill's decision reflects that he provided the following reasons for according limited weight to P.A. Thompson's opinions. First, P.A. Thompson's opinions regarding Plaintiff's psychological limitations were inconsistent with her treatment notes which reflect a "normal neurological exam and no disabling level of pain." (AR 19.) *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). This conclusion is supported by Plaintiff's MMSE, which revealed no cognitive impairments.

Second, ALJ Merrill noted that Plaintiff underwent only "minimal treatment for psychological symptoms" (*id.*) which were "mostly stable" during the relevant period and that long periods of time elapsed during which Plaintiff reported no psychological symptoms. However, he did not identify those periods where Plaintiff reported no psychological symptoms, and did not evaluate the extensive medication regimen Plaintiff underwent to treat her psychological symptoms, which included increasing dosages of Cymbalta and Zoloft over a period of several years. *See Hall v. Astrue*, 677 F. Supp. 2d 617, 632 (W.D.N.Y. 2009) (noting that the ALJ's "omitt[ing] any mention of plaintiff's medication history . . . raise[ed] doubt as to whether the entire record was considered").

---

[8] Pursuant to 20 C.F.R. § 404.1502(a)(8), a licensed physician assistant is considered an acceptable medical source "for impairments within his or her licensed scope of practice[.]" However, this provision is applicable "only with respect to claims filed . . . on or after March 27, 2017." *Id.* As Plaintiff's claim was filed prior to that date, this provision does not apply to the instant action.

24

The record further discloses that P.A. Thompson noted worsening symptoms of depression in November of 2010, that Plaintiff continued to experience stress through 2011 and exhibited dysphoric mood and occasional suicidal ideation throughout 2012. It was not until 2013 that P.A. Thompson observed that Plaintiff's psychological symptoms had consistently improved as a result of her prescribed use of medication. Against this backdrop, ALJ Merrill's conclusion that Plaintiff's psychological symptoms were "mostly stable" is not well supported by the record.

Third, ALJ Merrill reasoned that Plaintiff's daily routine contradicted P.A. Thompson's opinions that Plaintiff had moderate limitations in the activities of daily living and marked limitations in social functioning and in maintaining concentration, persistence and pace. These conclusions are supported by the record which reveals that Plaintiff drives, uses Facebook, socializes with friends and family, watches television, occasionally performs household chores, and prepares microwaved meals. *See Scitney v. Colvin*, 41 F. Supp. 3d 289, 302 (W.D.N.Y. 2014) (holding that the inconsistency between the medical source's opinion and the medical record are "good reasons" for the ALJ's decision to reject that source's opinion).

Finally, ALJ Merrill recognized that P.A. Thompson does not specialize in psychology, a factor that lessened the weight to which her opinions were entitled regarding Plaintiff's psychological limitations. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist.").

ALJ Merrill similarly concluded that P.A. Thompson's opinions regarding Plaintiff's physical limitations were "overstated" (AR 19) and that Plaintiff's medical records "do not reflect disabling pain or functional limitations due to back pain and related symptoms" (AR 17) because her clinical examinations were largely normal and her radiating pain occurred only sporadically. These conclusions are partly supported by the record, which indicate that, notwithstanding Dr. Trice's diagnosis of inflammatory arthropathy, Plaintiff experienced radiating pain on an infrequent basis and maintained

good ranges of motion in her extremities with only occasional swelling and tenderness. They are also consistent with the treatment notes of P.A. Hemond, who attributed Plaintiff's discomfort to "deconditioning" (AR 600), recommended she visit a physical therapist and continue the use of a TENS unit, and recorded that, in any event, Plaintiff did not experience significant discomfort. However, ALJ Merrill's conclusion that Plaintiff did not sustain significant functional limitations is inconsistent with Dr. Abramson's opinion that Plaintiff was limited to performing light work due to her back pain and Dr. Knisely's opinion that Plaintiff must change positions to ease her discomfort for three to five minutes each hour. ALJ Merrill, rather than this court, was authorized to resolve this conflict in the evidence. *See Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012) ("In our review, we defer to the Commissioner's resolution of conflicting evidence").

Although a close question, ALJ Merrill provided sufficient "good reasons" for according little weight to P.A. Thompson's opinions regarding the extent of both Plaintiff's physical and psychological limitations. While ALJ Merrill could have provided a more detailed analysis under § 404.1527(c), "the substance of the treating physician rule was not traversed." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (per curiam).

## CONCLUSION

For the foregoing reasons, the court GRANTS IN PART AND DENIES IN PART Plaintiff's motion for an Order reversing the Commissioner's decision (Doc. 13) and DENIES the Commissioner's motion to affirm (Doc. 17). On remand, the ALJ is directed to render a new RFC determination reflecting the limitations stemming from Plaintiff's severe mental health impairments. His RFC determination must also reflect Plaintiff's physical limitations, which include a requirement that she change positions for an aggregate of three to five minutes per hour. In the alternative, the ALJ must provide good reasons for rejecting that limitation. Based upon his RFC determination, the ALJ shall decide whether Plaintiff is capable of performing her past relevant work and/or work that exists in substantial numbers in the national economy.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 16th day of June, 2017.

Christina Reiss, Chief Judge
United States District Court